Matthew LOCKARY, et al., Plaintiff,

v.

Paul KAYFETZ, et al.; Victor Amoroso; Mary Lowry; Diana Lopez Fransworth; Frederick B. McClellan, et al.; Peter Warshall, et al., Defendants–Appellees,

v.

PACIFIC LEGAL FOUNDATION, Appellant.

No. 91–15384.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1992.

Decided Sept. 9, 1992.

Anthony T. Caso, Pacific Legal Foundation, Sacramento, Cal., for appellant.

Richard E.V. Harris, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for defendants-appellees.

Before GOODWIN, FLETCHER and T.G. NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

Pacific Legal Foundation ("PLF") appeals sanctions imposed on it by the district court for its conduct while "representing"

owners of undeveloped land in Bolinas, California in their suit against the Bolinas Community Public Utility District. PLF argues that the court erred in imposing sanctions against it rather than against the individual attorneys who signed the offending pleadings and other papers, that the sanctions violated its and "its clients'" First Amendment rights, that sanctions were imposed for conduct that was not sanctionable, and that the court erred in calculating the amount of sanctions. We affirm in part, reverse in part and remand.

## FACTS

Bolinas is a small community in northern California. In 1982, as the nominal plaintiffs, owners of undeveloped land in Bolinas filed suit against the Bolinas Community Public Utility District ("BCPUD"), against present and former BCPUD directors and against private individuals. The focus of the suit was a moratorium on water hookups BCPUD originally imposed in 1971 and essentially reenacted in 1973 and 1977; the thrust of the plaintiffs' claims was that the defendants had prevented them from developing their land. The plaintiffs alleged regulatory takings, substantive and procedural due process violations and equal protection violations and they also made antitrust claims. They sought damages of $30 million ($10 million trebled under the Sherman Act), and declaratory and injunctive relief. PLF, a nonprofit corporation, contacted and organized the plaintiffs and paid for the litigation. PLF, itself, from time to time in similar litigation has been a party, or has held itself out as representing parties; this suit was part of its ongoing effort to protect private property rights against "community no-growth policies". In this litigation, PLF sometimes has held itself out as the representative of the plaintiffs, sometimes as the employer of the plaintiffs' lawyers, and always as the entity directing the litigation and "calling the shots."

The case has been lengthy and stormy. In 1984, the district court granted BCPUD's motion to dismiss as to certain claims and defendants. *See Lockary v.*

*Kayfetz,* 587 F.Supp. 631 (N.D.Cal.1984) (*Lockary I*). In 1987, it granted summary judgment in favor of the defendants on all remaining claims. The district court's grant of summary judgment was affirmed in part and reversed in part by this court. *See Lockary v. Kayfetz,* 917 F.2d 1150 (9th Cir.1990) (*Lockary II*). In May 1991, at plaintiffs' request, their remaining claims were dismissed with prejudice.

After the district court ruled in their favor on the summary judgment motion, the defendants sought sanctions against the plaintiffs, PLF and individual attorneys. The district court, with the agreement of the parties, appointed a magistrate as special master and referred the sanctions issue to him. The magistrate initially filed a draft report, and sought comment from the parties. After receiving the parties' responses, the magistrate filed a final report, which the district court adopted in full in an April 2, 1990 order.

The magistrate did not recommend that sanctions be imposed on the plaintiffs themselves. After extensive discussion of all the plaintiffs' claims and several specific motions, he ultimately recommended imposition of sanctions on PLF for seven instances of misconduct.

At the conclusion of his report, the magistrate recommended that the court hold further hearings to determine whether individual attorneys employed by PLF should be sanctioned. However, the magistrate later recommended that such proceedings not go forward. He was concerned about the due process rights of the attorneys. Although his findings regarding PLF strongly suggested the attorneys were culpable, they had had no opportunity to respond in their individual behalfs at that stage of the sanctions proceedings. He also feared that it might appear that he could not be impartial in subsequent proceedings. In an order dated October 24, 1990, the district court adopted the recommendation "that all sanctions proceedings against individual attorneys be terminated

immediately and permanently." The defendants have not appealed this order.

The magistrate also prepared a second report on the "character and magnitude" of sanctions, in which he set forth a calculation of the amount of the defendants' attorneys' fees that PLF should pay. The district court adopted this report as well. In an order dated February 7, 1991, it imposed sanctions on PLF in the amount of $136,-434.50.

The order dismissing plaintiffs' claims stated that the court's prior orders as to sanctions would remain in effect.

## STANDARD OF REVIEW

"[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination. A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990).

## DISCUSSION

I. Imposition of Sanctions on PLF as an Entity

■ PLF argues that the district court erred in sanctioning it, rather than the individual attorneys who signed the pleadings or other papers the court found sanctionable. We find no merit in this contention.[1]

The district court imposed sanctions on PLF, the entity which had controlled the litigation of the Bolinas suit and was, in the court's view, responsible for the substantial abuse of the court system. The court recognized that neither Federal Rule of Civil Procedure 11 or 28 U.S.C. § 1927 gave it the power to sanction PLF. Rule 11 provides for sanction against the individual attorney or party or agent of a party who *signs* an abusive pleading or motion. Fed. R.Civ.P. 11; *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 122,

---

1. Although we might find that individual counsel were sanctionable and even that they should have been sanctioned, that issue is not before

us. The fact that individual attorneys were not sanctioned does not preclude sanctions against PLF.

110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989). Section 1927 is limited to attorney misconduct: it allows the court to sanction "any attorney ... who ... multiplies the proceedings in any case unreasonably and vexatiously."

The district court concluded, however, that it could rely on its inherent powers to sanction PLF as the responsible entity. We agree. In a recent decision that came down not long after *Pavelic*, the Supreme Court explained that a court may use its inherent power to reach misconduct that is beyond the scope of Rule 11 and Section 1927:

> There is ... nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the other sanctioning provisions. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the rules. A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.... Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the rules, the court ordinarily should rely on the rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the rules are up to the task, the court may safely rely on its inherent power.

*Chambers v. NASCO, Inc.,* —— U.S. ——, —— - ——, 111 S.Ct. 2123, 2135–36, 115 L.Ed.2d 27 (1991) (citation omitted). In *Chambers,* the district court was confronted by a party to the lawsuit who had acted fraudulently "outside the confines of the courtroom" to deprive the court of jurisdiction, had filed false and frivolous pleadings whose true nature could not be known until after the trial on the merits, and had engaged in "tactics of delay, oppression, harassment and massive expense to reduce [the opposing party] to exhausted compliance." *Id.* at ——, 111 S.Ct. at 2131 (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.,* 124 F.R.D. 120, 138 (W.D.La.1989)). This misconduct was largely outside the scope of Rule 11 and entirely outside Section 1927 because Chambers was a party, not an attorney, and most of his bad acts took place outside the strict confines of the case and the courtroom. The district court relied on its inherent powers to sanction these "'acts which degrade the judicial system.'" *Chambers,* —— U.S. at ——, 111 S.Ct. at 2131 (quoting *NASCO,* 124 F.R.D. at 139). The Supreme Court found "no abuse of discretion in resorting to the inherent powers in the circumstances of this case." *Chambers,* —— U.S. at ——, 111 S.Ct. at 2136. We reach the same conclusion here. To use the language of *Chambers,* in the "informed discretion" of the district court, Rule 11 and Section 1927 were not "up to the task" of sanctioning PLF's misconduct. The district court thus properly imposed sanctions pursuant to its inherent power.

PLF argues that *Pavelic* limits the court's inherent powers, as well as its powers under Rule 11. However, much as the *Pavelic* court extolled the virtues of punishing the *signer,* the Court made quite clear that the foundation of its decision was the "plain meaning" of the "specific text" of Rule 11. 493 U.S. at 122, 110 S.Ct. at 458. The Court's policy concerns were expressed in the context peculiar to Rule 11: "the purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility." *Id.* at 126, 110 S.Ct. at 460. *Chambers,* which came after *Pavelic,* makes clear that there are situations where exercise of the court's inherent powers is appropriate and needed. Thus, *Pavelic* is not as broad as PLF suggests.[2]

**2.** PLF cites dicta from the Fourth Circuit decision in *Blue v. United States Dept. of Army,* 914

■ PLF also takes issue with the district court's factual finding that it was responsible for the sanctionable conduct. PLF contends that it merely provided logistical support to the individual attorneys who represented the plaintiffs, and did not participate as an entity in any way in this suit. The record belies this assertion. While the PLF attorneys did not identify themselves as PLF employees in the signature block of the motions and pleadings, the heading of each court paper they filed listed the attorneys' names, followed by the name and address of PLF. Moreover, the plaintiffs were represented by a constantly changing cast of PLF attorneys, including PLF's president. PLF funded the litigation in its entirety. In its analysis of PLF's involvement, the district court relied on statements by PLF's president vaunting the importance of the Bolinas suit for PLF, and placing the case in the context of other, similar suits by PLF. The district court found that PLF was not "a mere passive and abstract institutional backdrop", but was, rather, "the sponsor of this litigation, and was actively involved in all phases of the case." We agree.

As our discussion below of the sanctioned conduct suggests, the course of the litigation makes clear that in this case the nominal plaintiffs' interests ran a far distant second to PLF's own goals. The claims raised, particularly the antitrust claims and the "Mesa Ranch" claims, bear little relationship to the nominal plaintiffs' economic or other concerns. PLF contends that it merely furnished counsel to the plaintiffs "who could not otherwise afford to present their claims in court." *Appellants' Opening Brief* at 4. It acknowledges, however, that as a foundation it seeks "to participate in precedent setting litigation in the public interest." *Appellants' Reply Brief* at 3. The course of this litigation suggests PLF's goal was to establish a legal precedent, and that the nom-

inal plaintiffs were merely pawns or puppets in this effort. Tellingly, once this court reversed in part the district court's grant of summary judgment against PLF's "clients", thereby setting in the appellate court opinion the kind of precedent PLF sought, the nominal plaintiffs petitioned the district court to dismiss the suit with prejudice. While the original complaint sought substantial monetary and injunctive relief for the named plaintiffs, alleging great harm to their economic interests, suddenly, when the road to recovery was reopened, the case was abandoned. The named plaintiffs gained nothing.

The record strongly supports the district court's finding that PLF itself was directly responsible for the sanctioned misconduct. The district court did not abuse its discretion in sanctioning PLF.

## II. First Amendment Violation

PLF argues that imposition of sanctions on it violated it and its clients rights to "litigate issues of constitutional dimension."

■ PLF cites no cases in which the imposition of sanctions on counsel has been held to violate the right to litigate controversial issues and vindicate clients' legal rights. It relies primarily on *National Association for the Advancement of Colored People v. Alabama*, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964) and *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). In the former, the Supreme Court held that the state of Alabama could not use its laws governing the right of an out of state corporation to do business in the state to prevent the NAACP from conducting its activities in Alabama. In the latter, the Court held that South Carolina Supreme Court Disciplinary Board could not use a rule regulating attorney solicitation to prevent the ACLU from

F.2d 525 (4th Cir.1990). In *Blue,* the Fourth Circuit opined that after *Pavelic,* it is "doubtful that [sanctions theories other than Rule 11] will support sanctions against an entire firm rather than against the individual lawyers who acted improperly". 914 F.2d at 549. However, this opinion is inapposite here: at issue is not the

court's effort to sanction a law firm rather than individual attorneys, but the court's use of its inherent powers to reach the entity truly responsible for abuse of the legal system. As PLF has repeatedly asserted, and we agree, it is not a law firm.

sending a letter to a prospective litigant. These cases recognize that public interest advocacy organizations enjoy protected rights to solicit clients and otherwise promote their legal activism. However, neither case supports PLF's position that abuse of the court system is constitutionally protected when a public interest law organization is the perpetrator.

We have recognized that, because of the potentially chilling effect on innovative lawyering, "we reserve sanctions for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Operating Engineers Pension Trust v. A–C Co.*, 859 F.2d 1336, 1344 (9th Cir.1988). However, in such rare cases, we will sanction misconduct even where the responsible party claims noble motives. We agree with the Eleventh Circuit that "[s]tatus as a public interest law firm or the nature of a claim does not confer immunity from attorneys' fees for bringing and maintaining frivolous lawsuits." *Avirgan v. Hull*, 932 F.2d 1572, 1582–83 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992).

### III. Sanctionable Conduct

The district court reviewed PLF's claims and motions in detail. It ultimately decided to sanction only a few instances of conduct. PLF argues that sanctions were improper in each instance.

#### A. *The Abstention Motion*

■ The district court imposed sanctions on PLF for filing a frivolous motion for *Pullman* abstention. *See Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (federal district court should abstain from exercising jurisdiction when a federal constitutional issue might be mooted or altered by a state court resolution of a pertinent state law issue).

In 1983, defendant County of Marin (not a party to this appeal) requested the district court to abstain. PLF opposed that motion; one of its arguments was that the

plaintiffs' claims "do not turn on any sensitive social policy recognized by law."

In 1985, PLF itself moved for the court to abstain. It contended that the Supreme Court's then-recent decision in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) required the district court to abstain, because under *Williamson County*, a Fifth Amendment takings claim was not ripe until the property owner has exhausted procedures the state provides for compensation. *See* 473 U.S. at 195, 105 S.Ct. at 3121. The California Supreme Court had previously held that no state compensation was available for regulatory takings, *Agins v. City of Tiburon*, 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25, 29–31 (1979), *aff'd on other grounds*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), but PLF argued that it was unclear whether *Agins* would extend to the kind of regulatory action present in the plaintiffs' case. PLF also argued at this time that the issues in its case "have been 'repeatedly noted' to be a sensitive issue of social policy."

The district court did not rule on the abstention motion immediately. PLF renewed the motion in 1987. At that time, it argued in addition that the Supreme Court's decision in *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), which expressed explicit disapproval of *Agins*, also supported abstention because it further muddied state law. In truth, however, *First English* did not affect the plaintiffs' claims because *Williamson County* required recourse only to compensation procedures available "at the time of taking". *Williamson County*, 473 U.S. at 194, 105 S.Ct. at 3120. PLF also offered to dismiss certain claims and defendants to "facilitate" dismissal, although it made dismissal contingent on the grant of abstention. At this time, the court denied the motion and granted summary judgment in favor of the defendants.

The appropriateness of sanctions for this motion is a close question. The substance of the *Williamson County* decision and its

timing support PLF's argument that it moved for abstention in 1985 in response to a change in the substantive law, although *Agins* undercuts this argument. However, the district court may have been influenced in its decision to sanction by PLF's conduct in renewing the motion for abstention in 1987. There, PLF's motivations in renewing at that time indeed seem suspect: the motion was renewed in the face of the district court's imminently expected ruling on the summary judgment motions before it. Furthermore, PLF's contingent offer to dismiss some claims and some of the defendants seems a disingenuous effort to keep some of the case alive while sacrificing part of it. However, this games playing cannot justify sanctioning the original filing of the motion. Because we cannot conclude that the motion for *Pullman* abstention was legally frivolous in its inception, it is difficult to justify sanctions for a strategy designed to push the district court along to a ruling. Accordingly, we find that the district court erred in imposing sanctions for this motion.

### B. *The Procedural Due Process Claim*

The plaintiffs claimed that BCPUD and certain individual defendants had violated their right to procedural due process by failing to provide them with individual notice of the decisions to impose and reimpose the moratorium, and of various administrative decisions regarding water permits requested by individuals. They also argued that the BCPUD, whose members used water supplied by the district, could not be neutral decisionmakers in ruling on new applications for water use. The district court found that the "entire procedural due process claim [was] legally frivolous, unreasonable, and pursued in bad faith." It concluded that the claim was "frivolous under existing due process law, and was not a good faith attempt to extend or modify that law."

On appeal, we affirmed summary judgment in favor of the defendants on the notice issues, holding that under California law the plaintiffs had no property interest in water they had not yet received, and thus were not entitled to notice. *Lockary II*, 917 F.2d at 1156.

PLF argues its procedural due process claims were based on a good faith effort to extend existing law. In *Bi–Metallic Investment Company v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915), the Supreme Court held that when the government imposes a "rule of conduct [that] applies to more than a few people" or "general statute," individualized notice to potentially affected parties is not necessary. The Court distinguished its earlier decision in *Londoner v. Denver*, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), in which it had held that when "[a] relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual grounds," those persons were entitled to a hearing. *Bi–Metallic*, 239 U.S. at 446, 36 S.Ct. at 142.

PLF argues that it was seeking an exception to the *Bi–Metallic* rule, in reliance on *Frontier Airlines, Inc. v. Civil Aeronautics Bd.*, 349 F.2d 587 (10th Cir.1965). That case involved the applications of competing airlines for the right to service certain airports. The Tenth Circuit held that when the Civil Aeronautics Board held hearings on service, it was required to consider Frontier's previous applications to provide them. It held that the Board was required to "consolidate for hearing all applications that are competing and mutually exclusive in nature," because when one application was heard and granted, all competing applications were "effectively denie[d], without a hearing." 349 F.2d at 590. PLF suggests that all Bolinas residents were "competitors" for the same scarce resource. The limited number of owners of undeveloped property who sought water hookups were thus entitled to notice of any administrative proceedings regarding water allocation, because any grant of a permit necessarily affected their chance of getting a hookup. PLF also suggests the plaintiffs' case was closer to *Londoner*, the case distinguished in *Bi–Metallic*, than to *Bi–Metallic* itself.

We agree that PLF's litigation of this claim was a legitimate effort to modify the law. A more recent decision by this court suggests that PLF correctly anticipated that courts may create fact-specific exceptions to the *Bi–Metallic* rule. In *Harris v. County of Riverside*, 904 F.2d 497 (9th Cir.1990), we held that the county deprived Harris of due process when it rezoned his property in such a way as to put him out of business. The zoning change at issue affected only two landowners (Harris, and the owner of land immediately adjacent to his), and was imposed after a local developer and a city councilman wrote the county board of supervisors requesting a zoning change to eliminate Harris' motorcycle park. Rejecting the county's proposed distinction between a "legislative" action (not requiring procedural due process) and an "adjudicatory or administrative" action (requiring procedural due process), we observed that "the character of the action, rather than its label, determines whether those affected by it are entitled to constitutional due process." 904 F.2d at 501–02.

Admittedly, one aspect of PLF's litigation of this issue is particularly troubling: PLF made this claim on behalf of some plaintiffs who under no stretch of the imagination could have been entitled to notice of the 1977 reenactment of the moratorium, because they did not own property in Bolinas at that time. In addition, PLF's litigation tactics were at times extremely aggressive; for example, it gratuitously insinuated that the defendants actively attempted to keep two of the plaintiffs from getting a water hookup under a "grandfather clause": "Failure to give affected property owners or at least those with applications on file notice that the rules had been changed and later repealed strongly suggests that defendants were intentionally avoiding those such as the Gilberts to deprive them of the opportunity to exercise their rights...." *Opposition to Defendant's Motion for Summary Judgment* at 7. However, the district court imposed sanctions because it found PLF's legal position was frivolous and taken in bad faith. We cannot agree. We thus reverse the district court's imposition of sanctions for the assertion of this claim.

## C. *Failure to Comply with the Court's Order Requiring More Specific Pleading*

■ After the plaintiffs filed their initial complaint, the district court, in response to motions by the defendants, ordered the plaintiffs to submit an amended complaint. It specifically ordered them to "plead with specificity facts which indicate a nexus between each defendant and the alleged wrongs suffered." The plaintiffs filed an amended complaint, and the defendants again moved to dismiss. In ruling on the defendants' motions to dismiss, the district court criticized PLF strongly, finding the amended complaint "added virtually no specificity." It found this lack of specificity was "fatal to some of [the plaintiffs'] claims against some defendants" and dismissed those claims.

The district court later imposed sanctions on PLF because the amended complaint did not comply with its earlier order, but rather "simply recycled the conclusory allegations of the amended complaint." It found that "counsel for plaintiffs acted unreasonably and in bad faith when, despite Judge Williams' clear order, they refused to set forth in the amended complaint the specific acts by the individual defendants that allegedly offended the constitutional and statutory norms relied on by plaintiffs."

The district court did not impose sanctions because it found PLF had merely engaged in inept or sloppy lawyering. A court may impose sanctions pursuant to its inherent powers only when it finds the action in question was taken in bad faith. *Chambers*, —— U.S. at ——–——, 111 S.Ct. at 2135–36. The district court's comments on the amended complaint make clear that PLF failed to comply with district court's direct and specific instructions. In imposing sanctions, the court found that PLF's "refusal to comply" was "unreasonabl[e] and in bad faith." Sanctions for this conduct were thus not an abuse of discretion.

### D. *The Antitrust Claims*

■ The district court sanctioned PLF for bringing "factually frivolous" antitrust claims against BCPUD and two of its directors, Paul Kayfetz and Doris Lemieux. Apparently, the plaintiffs' theory was that the defendants engaged in a conspiracy to restrain or monopolize the market in tourist accommodations. The antitrust claims were dismissed early in the case. The district court held that under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), BCPUD was not subject to Sherman Act liability, and that the individual defendants were shielded by the *Noerr–Pennington* doctrine. *See United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

The district court concluded that PLF's "fundamental failure" to produce any evidence supporting its theories, "in combination with PLF's failure to point to a cognizable property interest of the individual plaintiffs in the relevant markets" showed that PLF "prosecuted these particular antitrust claims in bad faith." It noted that PLF repeatedly characterized the individual plaintiffs, the Lockarys, Gilberts and Mr. Macey, as seeking only to construct single-family homes for their own use on their property; these statements suggested strongly that the plaintiffs had no interest in the tourist market they alleged the defendants sought to restrict. The court also pointed to the absence of evidence supporting the plaintiffs' theory of a conspiracy to monopolize, and to PLF's contradictory statements regarding the defendants' actions. It concluded, "While the undersigned gives PLF the benefit of reasonable doubt in the context of a sanctions action, this factual support is simply far too thin to conclude that PLF could have believed that its clients ever had the makings of a meritorious case on the antitrust claims involving the tourist accommodation and property development markets."

PLF contends that the district court could not require it to develop evidence on a claim that was laid to rest early in the litigation; it also contends that there was legal foundation for this claim. PLF distorts the district court's position. The court found that the absence of evidentiary support, the statements regarding the individual plaintiffs and PLF's weak efforts to suggest how it might have constructed its case, indicated that the antitrust claims were brought in bad faith and known to be bogus from the beginning. PLF seeks to justify after the fact the bringing of a cause of action the magistrate found was in bad faith from the very beginning of the case. In view of the weakness of these justifications, and of the detailed factual findings of the district court on PLF's handling of these claims, we find it was not an abuse of discretion to sanction PLF for filing the antitrust claims.

### E. *The Mesa Ranch Claims*

■ The plaintiffs included among their numbers Mesa Ranch, a limited partnership, and its general partner, Anton Holter. One acre of Mesa Ranch, a 210 acre property, lies within the Bolinas water district. In their inverse condemnation claim, these plaintiffs alleged that BCPUD and its directors had publicized an intent to condemn the Mesa Ranch property to depress its value, in order that it could be acquired more cheaply. The plaintiffs also alleged regulatory taking and substantive due process violations.

The district court imposed sanctions on PLF not because it found the claim legally frivolous, but because it found "subjective bad faith" in PLF's "presentation" of the claim. It found that PLF deliberately avoided specifying its theories underlying the claims, and identified several contradictory statements in papers related to these claims. It concluded that "PLF conveniently shifted ground when it was faced with adverse facts or legal doctrine," and that "[t]he protean nature of the Mesa Ranch inverse condemnation cause of action needlessly and unreasonably multiplied and confused the proceedings."

PLF suggests that the sole basis for the "massive sanctions" on this issue was the

district court's finding that it "shifted the grounds of its claim during this litigation." It also argues that the district court found it contradicted itself as to the defendants' motives for their actions, while motive is not an element of an inverse condemnation claim under *Klopping v. City of Whittier*, 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972). However, the district court's findings go beyond this. It found that PLF shifted its allegations to suit its purposes, in such a way as to make it more difficult for the district court to address the claims and more costly for the defendants to respond to them. While PLF suggests that there were few papers filed with respect to these claims and thus few opportunities to "shift" claims, it seems significant that several of the contradictory allegations came in papers filed in opposition to the defendants' efforts to get rid of the claims, on motions for summary judgment or motions to dismiss. The district court concluded that "the obfuscatory and inconsistent manner in which PLF presented this claim throughout the course of this litigation was deliberate, not merely a product of sloppy lawyering." Imposition of sanctions for PLF's continual effort to "move the target" was not an abuse of discretion.

### F. *The Motion to Strike*

 Early in the litigation, several defendants filed motions to strike or dismiss certain claims. PLF filed a counter motion to strike some of these motions. With regard to three of the motions, it contended that the defendants had improperly submitted affidavits and other supporting materials. It contended that another defendant's motion was late. In support of its motion to strike defendant BCPUD's motion, it argued BCPUD had failed properly to move the court for relief because it had not filed a *motion* to strike, but only a notice of motion and a supporting memorandum. The district court found that this final claim for relief was asserted "in bad faith and unreasonably and vexatiously multiplied the proceedings."

In the past, we have held that "if there is a colorable claim to a particular type of relief on a given set of facts and the signer relies on an unsupportable legal theory to bolster his claim when a supportable one exists as well, the signer cannot be sanctioned under Rule 11." *Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir.1990) (en banc). Here, however, PLF raised only one argument in support of its claim for relief against BCPUD, and the district court found PLF took this position in bad faith. While the court did not find PLF's other claims in the same motion to be sanctionable, those sound claims cannot shield this improper one. We thus hold that the district court's sanctioning of this act of gratuitous overlitigation was not an abuse of discretion.

### IV. Amount of Sanctions

PLF challenges several aspects of the magistrate's calculation of the amount of sanctions. It finds error in several specific calculations, in the award of attorneys' fees for the defendants' preparation of the sanctions motion, and in the magistrate's method of calculation.

### A. *Method of Calculation*

PLF argues that the district court erred in its method of calculating the amount of sanctions. It contends that the magistrate "proceeded without any evidence in formulating the amount of the attorneys' fees to be awarded." *Appellants' Opening Brief* at 47.

This court has required that "a sanctions award be quantifiable with some precision and properly itemized in terms of the perceived misconduct and the sanctioning authority." *In re Yagman*, 796 F.2d 1165, 1184 (9th Cir.), *amended*, 803 F.2d 1085 (9th Cir.1986), *cert. denied*, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). "When the sanctions award is based upon attorney's fees and related expenses, an essential part of determining the reasonableness of the award is inquiring into the reasonableness of the claimed fees.... [T]he court must make some evaluation of the fee breakdown submitted by counsel." 796 F.2d at 1184–85.

■ The district court has set out in detail the calculations used to determine the amount of attorneys' fees awarded as sanctions. The magistrate took the time sheets and other materials the defendants' attorneys submitted as his point of departure. Because PLF generally addressed more than one claim in each of its papers, and the time sheets submitted by the defendants' attorneys did not break down the time spent answering a motion into the individual claims addressed in it, the magistrate concluded he was required to apportion the listed figures to arrive at the time spent on the frivolous claims or motions. This necessarily involved some estimation. In apportioning time, the magistrate attempted to take into consideration the role the particular attorney played in the legal action at issue and the complexity of the tasks she faced. The magistrate emphasized that he attempted to be conservative in his estimates. The magistrate thus made careful calculations on the basis of the voluminous records submitted to him. We find this method meets the requirements we have set for quantifying sanctions awards.

■ However, two items included in the magistrate's calculations are problematic. First, the magistrate included an amount for "second chair counsel" in each sanctions award. He reasoned that, "given the complexity and time demands of a case like this, it was reasonable for each law firm that represented one or more defendants to have a second lawyer keep up sufficiently with the case so that he or she was in a position to help meet deadlines, cover appearances, or handle communications with other counsel or clients when the lead attorney was not available." This part of the award is not based on the submitted timesheets and is highly speculative. A law firm would generally pass the billable costs of this "second chair" to its clients, and such costs would appear in some form in its timesheets. Without documentation, the magistrate should not have included this item.

Additionally, the magistrate included in his apportionment a figure to account for "work not directly reflected in or inferable from papers docketed in the court's file," such as time to interview and confer with clients, analyze documents, formulate strategies, and confer and coordinate with co-counsel. Again, we find that inclusion of this additional time, which was in no way supported by documentation, was improper.

With the exception of including these two items the district court did not abuse its discretion in adopting the magistrate's method of calculation.

B. *Fees for Defendants' Pursuit of Sanctions*

■ PLF argues that the district court erred in including the defendants' cost of preparing and supporting their motion for sanctions in the amount of sanctions it awarded.

We have not yet ruled on this question, and directly applicable authority from other courts is scant. In a case involving Rule 11 sanctions, the Fourth Circuit has held that costs of preparation of a sanctions motion cannot be included in the sanctions. *Introcaso v. Cunningham*, 857 F.2d 965, 970 (4th Cir.1988). However, in a case involving Rule 37(c) sanctions for discovery abuse, the Eighth Circuit has held that the sanctions can include the costs of seeking sanctions. *Booker v. Stauffer Seeds, Inc. (In re Stauffer Seeds, Inc.)*, 817 F.2d 47, 50 (8th Cir.1987). Lower courts have also taken differing positions. *Compare, e.g., NASCO, Inc. v. Calcasieu Television and Radio*, 124 F.R.D. 120, 143 (W.D.La.1989) (costs of bringing sanctions motion included in sanctions), *aff'd*, 894 F.2d 696 (5th Cir.1990), *aff'd*, — U.S. ——, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Blossom v. Blackhawk Datsun, Inc.*, 120 F.R.D. 91, 102 (Rule 11 sanction award including costs of pursuit of sanctions) (S.D.Ind.1988) *with Unanue Casal v. Unanue Casal*, 132 F.R.D. 146, 151–52 (D.N.J.1989) (declining to award attorneys' fees for bringing sanctions motion), *aff'd*, 898 F.2d 839 (1st Cir. 1990).

The Supreme Court's recent decision in *Cooter & Gell v. Hartmarx Corp.* fortu-

nately provides some guidance on this issue. The Court held that the party who sought sanctions under Rule 11 was not entitled to reimbursement for the costs of defending an award of sanctions on appeal. The Court rejected the argument that such costs were incurred "because of" the sanctioned party's filing of the offending pleading. The court refused to adopt the position of the party seeking sanctions that "[it] would have incurred none of [its] appellate expenses had petitioner's lawsuit not been filed." *Cooter & Gell*, 496 U.S. at 406, 110 S.Ct. at 2461. The court found that "[t]his line of reasoning would lead to the conclusion that expenses incurred "because of" a baseless filing extend indefinitely. The court reasoned:

> We believe Rule 11 is more sensibly understood as permitting an award only of those expenses directly caused by the filing, logically, those at the trial level. A plaintiff's filing requires the defendant to take the necessary steps to defend against the suit in district court; if the filing was baseless, attorneys' fees incurred in that defense were triggered by the Rule 11 violation. If the district court imposes Rule 11 sanctions on the plaintiff, and the plaintiff appeals, the expenses incurred in defending the award on appeal are directly caused by the district court's sanction and the appeal of that sanction, not by the plaintiff's initial filing in district court.

*Id.* at 406–07, 110 S.Ct. at 2461.

*Cooter & Gell* suggests that the trial court should limit sanctions to the opposing party's more "direct" costs, that is, the costs of opposing the offending pleading or motion. We thus find that the district court erred in including the defendants' attorneys' fees for preparing their motion for sanctions in the sanctions it imposed.

### C. *Specific Errors*

■ PLF argues that "the court below erred by awarding fees for conduct that was not found to be sanctionable." It cites four specific examples.

PLF argues that the court awarded fees for defendants' opposition to a motion to intervene, that, according to it, "was completely unrelated to any conduct on the part of the plaintiffs." *Appellants' Opening Brief* at 45. The magistrate allowed reimbursement of 20% (a "modest percentage") of the defendants' attorneys' time spent on this, on the theory that "but for PLF's pursuit of this action, of which, at this juncture, vis-a-vis BCPUD, some 20% was devoted to sanctionable claims, there would have been no action in which Morganstein could have tried to intervene; moreover, one of the substantive predicates for his complaint in intervention tracked in essence the sanctionable procedural due process claims that PLF continued to press." We agree that inclusion of this item constituted an abuse of discretion: although Morganstein's intervention "piggybacked" on the action it had filed, PLF was not responsible for his decision to seek intervention or for the claims he chose to make.

■ The defendants' attorneys indicated they spent two hours researching and drafting their opposition to the plaintiffs' motion to strike. The district court found 100% of this time to be reimbursable. PLF is correct in its argument that because only one paragraph of this motion was found to be sanctionable, the district court should have apportioned the time.

PLF argues that the district court erred in awarding fees for the defendants' response to the original complaint although, in his report on sanctions, the magistrate refers only to the amended complaint. However, while the magistrate cites only to the amended complaint, the original complaint also included the claims the district court found to be frivolous or in bad faith. Thus, the district court did not err in ordering PLF to pay a portion of the defendants' attorneys' fees for responding to it.

■ Finally, PLF also contends the district court erred in awarding fees for the defendants' attorneys' participation in "settlement conferences and ... discovery proceedings" although "there was no finding of sanctionable conduct in any of these proceedings." *Appellants' Opening Brief* at 45. PLF cites to a page in the magis-

trate's report which does not mention a "settlement conference," but does refer to a "status conference." The district court awarded reimbursement of 20% of the defendants' attorneys' fees for this activity. This was not an abuse of discretion: the conference necessarily involved discussion of the claims the court found to be in bad faith.

### CONCLUSION

We affirm the district court's decision to sanction PLF. However, we find the district court erred in imposing sanctions for the procedural due process claim and the abstention motion. The elimination of these items will necessitate a recalculation of the dollar amount of the sanctions. We have also identified other errors in the calculation of the amount of sanctions. We remand to the district court for recalculation of the sanctions award in accord with this decision. The parties shall bear their own costs on appeal.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.