**In re SUPERIOR FAST FREIGHT, INC., Debtor.**

**NATIONAL MOTOR FREIGHT TRAFFIC ASSOCIATION, INC., Appellant,**

v.

**SUPERIOR FAST FREIGHT, INC., Appellee.**

**BAP No. CC–95–2222–HBO.**
**Bankruptcy No. LA93–54051 ER.**
**Adv. No. LA95–01496 ER.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Sept. 19, 1996.

Decided Oct. 25, 1996.

William W. Pugh, Alexandria, VA, for Appellant.

Gregory S. Abrams, Douglas C. Fabric, Tarzana, CA, for Appellee.

Before: HAGAN, BOWIE [1], and OLLASON, Bankruptcy Judges.

## OPINION

HAGAN, Bankruptcy Judge:

National Motor Freight Traffic Association ("National Motor") appeals the Bankruptcy Court's order granting the debtor-in-possession summary judgment on its section 547(b) preference avoidance action. We conclude the payment in issue was not a payment on an antecedent debt and REVERSE and REMAND.

1. Hon. Peter W. Bowie, Bankruptcy Judge for the Southern District of California, sitting by

### FACTUAL BACKGROUND

The Debtor, Superior Fast Freight, Inc. ("Superior"), is a motor carrier of general commodities. At all times relevant to this appeal, the Interstate Commerce Act ("ICA") required motor carriers to establish and maintain a freight classification and listing. Superior used the services of National Motor for this purpose.

National Motor is a nonprofit membership corporation organized under the laws of the District of Columbia. National Motor publishes the National Motor Freight Classification ("NMF Classification") on or about July 1 of each year. National Motor supplements the NMF Classification on an approximately monthly basis. A listing in the NMF Classification satisfies the freight classification and listing requirements of the ICA. Cancellation of a motor carrier's listing voids a carrier's tariff rate unless the carrier is also listed in another publication.

National Motor charges its participants for each year's listing in advance. Participants are not required to renew their listing in the NMF Classification for future years. However, because most participants relist each year, National Motor includes all currently listed motor carriers in each new year's addition, and sends the carriers an invoice for the upcoming year. The invoices state that the fee for the following year must be made in a single payment and that fees will not be prorated for less than a full year. If a carrier fails to timely pay its participation fee, National Motor sends a letter warning that their participation fees are overdue. National Motor cancels the listing of those carriers who do not pay their participation fees for the upcoming year via one of its monthly supplements.

National Motor contends there is no penalty other than removal from its NMF Classification for failure to make timely payment. National Motor seldom receives a request to cancel a listing and does not consider its unilateral listing as giving rise to a claim against a carrier.

designation.

Of the some 4,000 carriers listed in the 1992–1993 NMF Classification, 1,506 did not pay their participation fees until after the warning notice was sent. Of these, 356 carriers did not pay their fees after receiving final warning and National Motor cancelled their listings by supplement.

Between June 2, 1989, and late 1993, Superior satisfied the requirements of the ICA by listing in the NMF Classification. Consequently, in May of 1993, National Motor sent Superior an invoice for the upcoming fiscal year (*i.e.* July 1, 1993, through June 30, 1994). According to National Motor's invoice, payment of $2,591.00 was due on or before July 1, 1993, for the upcoming year. Superior did not pay the amount requested before July 1, 1993. Thereafter, National Motor sent Superior two warnings of imminent cancellation, one on July 14, 1993, and one in August of 1993. Both warned Superior that if payment was not delivered promptly, National Motor would cancel Superior's listing in the 1993–1994 NMF Classification. National Motor never requested pro-rata payment from Superior for its participation in NMF Classification between July 30, 1993, and the date the warnings were mailed.

Superior eventually forwarded payment by check dated September 9, 1993, which National Motor cashed on September 30, 1993.

Although Superior's 1993 payment was not substantially later than the late payments National Motor accepted from other motor carriers, it was about two months later than any of Superior's previous payments. Between 1989 and 1992, National Motor sent its invoices to Superior between May 30 and June 3. Superior paid these invoices sometime between July 7, and July 17 of the relevant years.

Superior filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on December 16, 1993. National Motor continued to list Superior after its filing. National Motor sent Superior an invoice in May of 1994, seeking a participation fee for the July 1, 1994, through June 30, 1995, NMF Classification. Because Superior did not submit a fee after receiving several notices, National Motor cancelled Superior's listing by Supplement No. 6 to NMF

100–U, effective December 3, 1994. National Motor has never attempted to collect a fee for the period between July 1, 1994, and December 3, 1994.

On February 10, 1995, Superior filed a complaint against National Motor to avoid and recover the September 1993 payment under section 547. The parties agree that the payment was made within the 90 day period preceding the date the Debtor filed its petition for relief.

The bankruptcy judge concluded the September 30, 1993, payment was a payment on an antecedent debt. He also concluded the payment was neither in exchange for new value nor in the ordinary course of business. Accordingly, the judge denied the National Motor's motion for summary judgment and granted summary judgment to Superior. National Motor timely filed this appeal.

## STANDARD OF REVIEW

We review a grant of summary judgment *de novo*. *In re Southland + Keystone*, 132 B.R. 632, 637 (9th Cir. BAP 1991). If the appellant is entitled to summary judgment, the panel may reverse the bankruptcy court and grant summary judgment in favor of the appellant. *C.F. Brookside Ltd. v. Skyview Memorial Lawn Cemetery (In re Affordable Housing Development Corp.)*, 175 B.R. 324, 329 (9th Cir. BAP 1994) (citing *O'Neill v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 981 F.2d 1450, 1458 (5th Cir.1993)).

The Ninth Circuit Court of Appeals has summarized the standards for granting summary judgment as follows:

"We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." [*Hughes v. United States*, 953 F.2d 531, 541 (9th Cir.1992).] ... The party moving for summary judgment must show by "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hughes*, 953 F.2d at 541. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *see Hughes*, 953 F.2d at 541–42. When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact. *See United States v. 1 Parcel of Real Property*, 904 F.2d 487, 492 n. 3 (9th Cir.1990); (citing *Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978)).

*Hansen v. United States*, 7 F.3d 137, 138 (9th Cir.1993) (second ellipsis in original).

## DISCUSSION

■ Five elements must be present for a transfer to be a preference recoverable under section 547:[2]

The transfer must "(1) benefit a creditor; (2) be on account of an antecedent debt; (3) be made while the debtor was insolvent; (4) be [made] within 90 days before the bankruptcy; and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made."

*Zenith Productions, Ltd. v. AEG Acquisition Corp. (In re AEG Acquisition Corp.)*, 161

B.R. 50, 54 (9th Cir. BAP 1993) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)).

■ National Motor denies the transfer was for an antecedent debt, but admits all of the other elements.

The term "antecedent debt" is not defined by the Code. However, the courts have concluded that:

[w]hether a debt is antecedent or current depends on when it was incurred. *In re Pan Trading Corp.*, 125 B.R. 869, 875 (Bankr.S.D.N.Y.1991) (citations omitted). A debt is incurred when the debtor first becomes legally obligated to pay. *In re CHG Int'l, Inc.*, 897 F.2d 1479, 1486 (9th Cir.1990).

*Upstairs Gallery, Inc. v. Macklowe West Development Co. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 918 (9th Cir. BAP 1994). This rule is consistent with the Code's definition of "debt," as "liability on a claim." 11 U.S.C. § 101(12).[3]

Superior contends that it became obligated to pay National Motor for its July 1, 1993, through June 30, 1994, listing fee on the date National Motor first sent Superior an invoice. National Motor contends that Superior never had a legal obligation to pay the listing fee because Superior did not contract with National Motor for a continued listing and consequently National Motor's only remedy in the event Superior did not pay the listing fee was to discontinue the listing.

---

**2.** Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provision of this title.

11 U.S.C. § 547(b).

**3.** In contrast a "claim" is defined more broadly as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

As a debtor-in-possession, Superior has the burden of proof to show it was legally obligated to pay the fee for listing from July 1, 1993, to June 30, 1994. 11 U.S.C. § 547(g). *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1217 (9th Cir.1988) (citing *Grover v. Gulino (In re Gulino)*, 779 F.2d 546, 549 (9th Cir.1985), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988)).

National Motor submitted the affidavit of Martin E. Foley ("Foley"), the executive director of National Motor. Foley testified that Superior and all of the other participating carriers purchase each year's NMF Classification listing in advance. National Motor and the listing carriers do not enter into contracts containing an automatic renewal clause. Thus, the carriers are not contractually obligated to continue listing with National Motor in subsequent years. However, most of the carriers do continue to list with National Motor for a number of years. Therefore, National Motor has found that it is more efficient to list and bill all of its carriers for the upcoming fiscal years regardless of whether they have affirmatively requested continued participation.[4] National Motor's unilateral actions do not create a contract.

Superior did not submit a contract or other evidence showing that Superior had contracted to pay for the July 1, 1993, to June 30, 1994, listing. Nor did it submit any other evidence indicating it had an obligation to renew its listing. The only evidence Superior did submit is the invoice sent by National Motor and Superior's attorney's conclusory statement that Superior was legally obligated to pay National Motor regardless of whether National Motor chose to enforce that right. Superior's attorney did not testify as to any facts demonstrating such a legal obligation.

■ Superior contended that it was legally bound to pay National Motor because contin-

ued listing is necessary to its business. However, a debtor's need (however great) for future services does not in itself create a legal obligation to purchase future services.

Nevertheless, it may be argued that National Motor has a quantum meruit right to payment for the actual value of the listing from carriers it gratuitously lists. But National Motor has never attempted to collect such a fee and cancellation is the sole aftereffect of failure to pay. Consequently, it would be difficult if not impossible for National Motor to prevail in a quantum meruit action for its unilateral provision of services, since it admits it possesses no claim under these circumstances. Thus, the invoice sent by National Motor was no more than an offer to enter into a contract and although Superior could and did accept the offer by paying the renewal fee, no obligation to pay the renewal fee was ever incurred by Superior.

Accordingly, as the only evidence submitted by Superior as to the existence of a contractual obligation is conclusory, and Superior has the burden of proof to show the existence of a debt, we conclude that National Motor is entitled to summary judgment on the ground that the payment in question was not payment on a "debt," antecedent or otherwise.

## CONCLUSION

We reverse and remand for entry of judgment in favor of National Motor on the ground the September 1993 payment was a voluntary renewal fee, not a payment on an antecedent debt.

---

**4.** In this regard National Motor's practices may be analogized to the magazine industry. Magazine subscribers pay in advance for a year's subscription. Towards the end of the subscription period, the magazine publisher begins sending invoices for renewals. If the subscriber does not renew, a publisher struggling to keep its subscription rate up may send the subscriber a few magazines after the subscription has lapsed. However, the subscriber is under no obligation to renew, and neither the invoices nor the publisher's unilateral decision to keep sending magazines creates an obligation on the part of the subscriber. The publisher's only recourse in the event the subscriber does not renew is to cease sending magazines to him.